Thank you, your honor. May it please the court. My name is Bruce Braley and I have the privilege of representing Steve and Teresa Williams from Atlantic, Iowa in this case. We are asking the court to reverse the district court's ruling denying our motion for a new trial and remand for a limited retrial only on the issue of the damages caused by Dr. Baum and  Justice Breyer That's a big rock pushing up a steep hill. Bruce Braley Excuse me, your honor? Justice Breyer You're pushing a big rock up a steep hill to get a motion for denial of a motion for a new trial reversed on appeal. Bruce Braley Well, I appreciate that, your honor, but there are clear and prejudicial against a non-party which is in violation of Iowa Code Chapter 668 which limits the consideration of fault to those listed on the verdict form. Dr. Michelle Peterson-Jones was a doctor who had been involved previously in Mr. Williams' care, was not a defendant at the time this case went to trial, and yet the defense was allowed to question and raise issues during opening statement, cross-examination of the plaintiff's experts, and closing arguments relating to the fault and proximate cause of conduct by Dr. Peterson-Jones which occurred three years before the conduct at issue in this case involving Dr. Baum. Justice Breyer I think the district court found that that was admissible as impeachment evidence of the experts. Is my recollection correct? Bruce Braley Well, that's what the court found, but the impeachment did not go to the fault of Dr. Baum. It went to the impeachment of the fault of a witness who is not a party. And because this is a failure to diagnose cancer case... Justice Breyer No, no, they were impeaching the opinion. Bruce Braley No, they were attempting to impeach the opinion relating to causation and when the cancer could have been diagnosed and treated. And that's critical because in a failure to diagnose cancer case, you're talking about a continuum of time. And because Dr. Peterson-Jones was not a defendant, the only point in time relevant to this case was when Dr. Baum admitted he failed to identify the tumor on the x-ray in January of 2018. Justice Sotomayor But what... Justice Breyer You seek a new trial on damages and then you say this was wrongly admitted because it impeached, it impeached, it did not impeach fault when it impeached damages. Justice Breyer No, that... Justice Sotomayor It was relevant, it was relevant to damages and the experts who of course formed their opinions when Peterson-Jones was a defendant had to stick with their, had to stick with the opinions or they would have lost all credibility. So I view this frankly as a self-inflicted wound. Justice Breyer No, Your Honor, I disagree with that because at the time the case went to fault and because of the timing... Justice Sotomayor I'm talking about the, I'm talking about the credibility of the, of the, the compare, the jury has to compare the credibility of the competing experts on survival and so forth, right? Justice Breyer Right, but the experts had different opinions on what time the cancer could have been diagnosed. So for example, the causation expert caused by the plaintiff said that it was 55% if it had been identified... Justice Sotomayor I'm not just focusing on the survival issue. Justice Breyer Yes, and that's what I'm focusing on. Justice Sotomayor Well, I know, but, but, but you want... their, their, their experts were, were attempting to say that, that the survival was reduced in the six months between Dr. Baum's failure to diagnose and when it was discovered... Justice Breyer Yes. Justice Sotomayor But the experts, but the, but the experts had said the, the, the loss of the, you know, it started in 2015, that was in their reports. Justice Breyer Right. Justice Sotomayor Now, now all you, if you, if you make the, the strategic or tactical decision to dismiss Peterson-Jones, maybe because her employer is still in the case, now you've either got, it seems to me you've either got to get new experts or this is going to happen, inevitably. Justice Breyer Your Honor, I respectfully disagree because the plaintiff's expert on causation gave two different opinions on survivability. One based on the timing in 2015, 55 percent. One based on Dr. Baum's negligent conduct in 2018, 35 percent. The defense expert said there was no difference in survivability based upon the research that inadequate foundation under Rule 803-18. And so there was a dispute on the issue of survivability, but it could have been and should have been framed based on when the only party in the case whose fault was at issue, Dr. Baum, failed to read on the x-ray what was clearly a tumor. And so... without the 2015 tumor. Because doesn't that have to be part of the story? Justice Breyer Sure, and it could have been part of the story as part of the linear treatment of Steve Williams. Isn't it true, for example, that Mr. Williams was evaluated in 2015? Yes. And isn't it true that there was a possibility that he had this cancer then? Yes. But the jury... I mean, in this case, it seems to me that causation and fault are just very closely related. Because if I'm a juror, and I see the evidence presented about causation, there's a tumor in 2015, and there's also one in 2018, and I'm asked to say what the survivability is post-2018, in that six to five and a half month period, I'm going to want to say, well, what happened in 2015? Like, why didn't anybody do anything then? And how does that play into Dr. Baum's liability? But it doesn't relate to the issue of damages in this case, because our claim was based on the fault of Dr. Baum and the damages arising from that. So in this case, we made a clear case that his life expectancy had been reduced by 35% based upon survivability in 2018. In your view, would evidence that if the tumor had been caught in 2015, it wouldn't have existed in 2018, would that be relevant? It could be relevant only if it had led to treatment at that time, Your Honor. How could it not be relevant? Well, it would be relevant if it were an issue, but the problem is the defendants... If it was in 2018 then, if it caused damage, it's only because the damage was still there to be caused when it shouldn't have been. Well, the damage had progressed further, yes. No, but if the tumor... I thought some of these experts say that if you catch it in time and have successful treatment, the tumor, if it's not disappeared, it's no longer a threat. Well, you're absolutely... So if that had happened in 2016... You're absolutely correct, Your Honor. And the jury... Doesn't the jury have to know... Doesn't the jury get to know that? Well, they don't... That's not an issue before them, because the plaintiff did not make it an issue and the defendant did not make it an issue. What's the kind of issue you want to be before them? Well, it's not an issue that the defendant brought before them either, because the defendant did not make a claim. They're defending against your theory. Yes. But your theory is that there was a tumor in existence and one of the defenses can be there shouldn't have... It shouldn't have been in existence. Well, that's true, Your Honor, but the facts of the case have to be tailored and the evidence to the case the jury is hearing. And in this case, it was prejudicial to allow all of those issues to be brought up regarding a party who was not before the court when the focus of the damage case was on the lost chance of survivability based on Dr. Baum's admitted negligence. And he did not contest the issue of negligence at trial. If we agree there were errors on these evidentiary issues, what is our standard of view on the denial of, review of the denial of the motion for mistrial? It's abuse of discretion, Your Honor, and we've cited in our brief that there are clearly prejudicial impacts of this ruling. And the impact is that without the admissibility of the articles and the extracts from the ability, then there would not have been a contrasting ability to argue that there was no impact on life expectancy. Because that was the only basis on which Dr. Silberstein rested his opinion that even though there was a six-month delay in diagnosis, where according to his own admission the tumor had doubled in size, there was no corresponding reduction in survivability. And so they formed the basis of that opinion. And as the court noted in Baker, if the evidence comes in improperly without the necessary reliability determination, and if you look closely at the questions that were cited in our brief, there was absolutely no evidence whatsoever of reliability upon which Judge Woolley could have made a finding that the articles themselves were reliable. Let me ask you what bothers me about your argument on the tests. It seems to me these were not, these were a little different kind of tests. These weren't really, you know, tests in the analytical. They were reports of clinical trials of people, you know, with the positive and negative. And they were simply, you know, this group, which has a lot of experience doing this, did this trial with these parameters and got this result. Now it seems to me it doesn't take, the testifying expert, if the testifying expert testifies to that, this is a highly regarded clinical trial, lab or research group or whatever, here's the trial they conducted, here were the results. What more in the way of reliability could be required? That's not what the expert said, Your Honor. If you look at the transcript. That's what I read. I haven't read the whole thing. No, and if you look at the specific questions that were asked by counsel, at each point there was no statement to the effect of what you just said. No, no. I didn't, they don't have to say it's reliable. They described who did the clinical trial, what they did, what the parameters were, and what the results were, period. It still doesn't get to the fundamental issue of reliability. Yes, it does. Well, that's my problem. Give me a case on a clinical trial expert. Your Honor, clinical trials and medical research are graded based upon the reliability of the sources that they base their testimony on. And in this case. They talked about, they said this is the premier group doing this kind of clinical trial testing. But that's not what this. What do they, do they have to bring in three more people to corroborate that? That's not what this expert said. That's not what the testimony is. Well, that's what I read. He never testified that the study was reliable. He never said that it was relied on by experts in his field. I didn't say that. I said he testified to the experience and stature in doing this kind of work. Counsel Exhibit T, there's testimony, this is the best article that talks about this sort of therapy. Why isn't that sufficient? He testified, I'm not sure which article you're referring to, Your Honor. It's the Rush article. The Rush article. That is Exhibit T. And here was the testimony. Okay, doctor, I'm going to show you Exhibit T. Is this a diagram that's taken from the Rush article? I made my foundation objection under 803.18. The court said overruled. You may answer. That was it. That was the foundation that was laid. This is a diagram taken from the Rush article. We're not limited to the foundation in reviewing this issue. We're limited by the total testimony as to whether it established. If the examination began with inadequate foundation, that can be remedied by the end of the testimony from the standpoint of the appellate court. Well, but one of the clear indications that Judge Woolley was not applying the rule properly was when he later made the comment at the time that Exhibit T was offered that it was admissible because the expert had testified about it, notwithstanding the foundation objection. And then later on in his post-trial ruling, the judge indicated that plaintiffs had been allowed to use these same exhibits based on the reliability when that had not happened at trial, Your Honor. Before you're out of time, I have another question on your last issue. The ending paragraph in 803.18, if admitted, the statement may be read into evidence but not received as an exhibit. What case has ever held that that is a categorical prohibition on exercising discretion to allow it to go to the jury room? I cannot cite you a case. There's almost no cases on this. We could find a Third Circuit case that discussed it very inadequately. I don't think that that can possibly be read as an absolute constraint on the discretion to say, well, with this particular exhibit, yeah, it could be read and it's been testified to but I think it's appropriate to have it and let the jurors see it in deliberations. I see no evidence. That case is not, that issue has not been argued. I see no evidence in the clear language of the rule or the comment that says there is an exception to the rule, which prohibits it from being taken back to the jury. Rules don't categorically bar discretion as a general proposition. Thank you for your time. We don't have a case but I didn't think so because we couldn't find one. Mr. Gray. Thank you, Your Honor. May it please the court. Your Honors, my name is John Gray. I'm from Sioux City and I represent Dr. Jeremy Baum and the Nebraska-Iowa Radiology Clinic. I would just like to respond first to the issue about Judge Colbert's question about what was said about Exhibit T. In our brief at page 26, I'm sorry, explains, so the Rush article is, this is from Dr. Silberstein, I think the best article that talks about  So it is an American article. It has the largest number of patients treated with chemotherapy, radiation therapy, and surgery for Pankow's tumor. This is the largest trial. What about the other two exhibits? Is there anything similar or even close to that? Yes. That seem to be a little bit different than the other two. Sure. And one of the, Dr. Silberstein has talked about Exhibit S. This is the Porel article. It's a French article.  Porel article is the second largest prospective. Prospective means they follow patients from the beginning. Rather than going backwards and picking them out. So this is the second largest trial in the literature that looks at trimodality. So that's chemotherapy and surgery for Pankow's tumors. And this was done in France. And that's what he had to say about that. As far as the Exhibit U, he said the gray, and this is also known as the Pacific trial, was a randomized trial for patients who had stage III lung cancer. And half the patients received chemotherapy and radiation. And half received chemotherapy, radiation therapy, followed by immune therapy. Throughout, that's what we quoted and that's what we cited. Just comments about those particular articles. When I took the cross-examination of the plaintiff's oncology expert, his name is Dr. Warden, Francis Warden. I asked him, and this is at page 209 and 210 of the record. I think I asked him, and I'm sorry if I'm paraphrasing, that he agreed with the statements that were made in the Porel, the gray, and the S argument. At least he said he had no argument with what he, or was in agreement with these statements in there. So there was no concern, at least at the time we took this testimony, at least from the defense side and obviously from Judge Woolley's side, that the doctor was not relying upon these and that they were in controversy. They seem to have been accepted. Would you address the relevance of Dr. Peterson-Jones' malpractice and the admission of that testimony? I will. In your view, how was that relevant? So, you may recall, Your Honor, that there were two defendants up until almost the eve of trial. And the plaintiff used the same experts, both for causation and for breach of standard of care, Drs. Marks and Dr. Warden. We had filed a Daubert motion as to Dr. Warden. It was denied. So we were left to cross-examine him. Now, breach of standard of care was not an issue at trial, was it? It was not an issue at trial. Okay, so it just comes down to causation. Really? Causation and damage as a result from the causation. Sure. And so, one of the complicated parts of this case was the action or the argument that there should be an award for loss of chance of survival. And the plaintiff presented evidence from Dr. Warden that in his deposition he said 40%. At trial he said 30%. And so, how did you get that number? Well, he didn't have any basis for how he came up with either of those numbers, either in his deposition before trial or at trial. So how could we do anything other than go, let's compare that to what you said earlier when you said there was a mistake and there was a loss of chance of survival back on March 15th of 2015. How do you make that determination? Because the jury was asked, and the plaintiff asked for this jury instruction, to come up with a percentage for loss of chance of survival. That's how that's irrelevant. We needed that for causation. But why particularly her standard of, breach of standard of care? Why even name, why have the name? Because what happened then in opening, and then in cross-examination of, I think, Dr. Marks, and then in closing it was, hey, it wasn't Dr. Baum, it was Dr. Peterson-Jones. So then the jury has in their mind someone else who is at fault for these damages, which, as I understand, is not the proper way to go in a case like this. Right. That's a good question, Your Honor, and I appreciate you asking it. There was never any allegation or argument in the opening statement or any of the cross-examination or direct testimony that Dr. Peterson-Jones, there was no argument, there was no line on the jury verdict form for any fault by Dr. Peterson-Jones. There was no request by the plaintiff's attorney for any sort of, if there had been some confusion, for any sort of jury instruction to say you're not to consider the fault of Dr. Peterson-Jones. It does come into account, though, when we are cross-examining Dr. Marks. Dr. Marks is, as he testified, he's testified 300 times. He testified that this is how much he charges. He gave us his billing and he took his certificate. In Iowa, in order to have a medical malpractice claim, you have to file what's called a certificate of merit affidavit. You have to do that and say that there's an issue, at least what I call probable cause, to go forward with the case. And he did that for both Dr. Baum and later he did that for Dr. Peterson-Jones. I wanted to tell the jury that this man would be hired, I paid a lot of money to say what he wanted them to say. That's a standard defense technique in medical malpractice cases when you're cross-examining experts. And one of the things he said is, I charge $600 an hour because that's what I have to pay, what I lose for not seeing patients. Well, then I asked him, well, now you've raised your rates and you're retired, so how do you justify that? Then he says, and I checked his billing, you're charging $600 an hour and it says you've charged one-tenth of an hour to sign your name with respect to Dr. Baum, but you charge two-tenths of an hour to sign your name with respect to Dr. Peterson-Jones because he had that on his billing. And I said, what would cause... He said, yeah, but I did a lot more than that. I said, well, what else did you do? And we had him read off what he assigned. And I said that that took two-tenths of an hour. My intent was to impeach the witness by how much he charges for what he does. And I understand that that's a standard line of cross-examination to impeach, but it still seems to be putting in... I'm still struggling with why Dr. Peterson-Jones has to be identified with the risk of confusing the jury. I think you could impeach the doctor on those, and it's the difference between .1 and .2, and you could get at that without pulling in the standard of care from Dr. Peterson-Jones. This wasn't a sole proximate cause. You didn't ask for an instruction on that. This wasn't an affirmative sort of defense of sole proximate cause, right? That is correct. So that's off the table. Yeah. The fault of Dr. Peterson-Jones, which there wasn't any, which is why I think he was dismissed. But those folks, as Judge Locken said, they're stuck with what they have said earlier. They have made these statements. They're inconsistent statements. And what specific statement are you referring to? Sure. The statement that this started back in March of 2015. This is when the loss of chance of survivorship started, which was in March 15th of 2015. That's how it applies. It applies to how he continues, or how he figures out the percentage that he says is loss of chance of survivorship. We... Dr. Warden's loss of chance of survivorship opinions, we had just tried to strike. He could not, as we had pointed out in our brief. His opinion as to loss of chance of survivorship was pure speculation. He said, if this had been a T-2, then the loss of chance of survivorship based upon the book, Exhibit 19, that Mr. Braley did admit to the jury, which was sent back to the jury as an exhibit, as were the medical literature. If this was a T-2, then he gave these opinions. But I pointed out to him in cross-examination that you were looking at the wrong table, that this is a Pankos tumor. And by definition, every Pankos tumor has to be at least a T-3. Now, why that makes a difference is that much of this case was fought over whether or not there would have been an ability to resect this tumor if it had been identified in January of 2018. Plaintiffs had no expert testimony. No surgeon came to court to say it could have been resected. Dr. Warden, who gave his opinion, said if it could have been resected, but he could not give that opinion because he's an oncologist. And because there had been invasion of the chest wall, there probably couldn't... According to even Dr. Marks, who said, once there is invasion of the chest wall, it's not resectable. Of course, our experts said the same thing. So the jury clearly could find, based on that evidence, that there was no loss of chance of survivorship, and that's exactly what they found. Judge Woolley, of course, as you know, was in the best position as the trial judge to balance out, to call the strikes and the balls. And he did that. And he was given the opportunity after the trial to determine whether or not a new trial should be given based upon many of the arguments we've heard about today. Well, what's your theory about the verdict? Sure. I mean, the testimony from the foreperson was sort of interesting. I'm wondering if counsel both thought, well, maybe we should have restructured that verdict form. But what do you make of it? What I made of it is, I think, what the judge made of it, which is... Because I stood up and I said, gee, I'd love a defense verdict, and that's what I argued for. But I think, in the end, the judge made the right decision. They asked the jury foreman, what did you intend to do? We intended to award $27,500 to the plaintiff. And I think left it at that. Even though the question number 2 was answered... It was negligent. Yeah. You know, I suppose I could have argued strongly and maybe objected to the motion for a new trial on the basis that the jury did vote no. They found negligence, but they voted no on causation. And, you know, many of the arguments about injecting Dr Peterson-Jones, still the jury found that Dr Baum was negligent. It didn't interfere with that one iota. There was no comparative fault. And in the end, the jury awarded, I think, what was, in their mind, a fair amount of damages to the plaintiff. But if I can follow up on your distinction there, they found that he was negligent, but not the cause of any damages, which might suggest that they had a named doctor in their mind. Well, really, the one who caused the damages is Dr Peterson-Jones. No, I don't... I can't... I'm sorry, Your Honor, I cannot agree with you. I don't think that's what they thought at all. I think the evidence came in that there was no lost chance of survivorship based upon this 5 1⁄2-month delay. And if there's... Oh, he would have been in the same position in July that he was in January, based upon the testimony of Dr Silberstein and others, based upon the relatively lack of good testimony from the expert Dr Warden. So there wouldn't be any future damages. There was no request for past medical expenses. There was certainly a lot of evidence in the record that this gentleman had a rotator cuff tear in his shoulder that was giving him a lot of pain, that he had surgery on January the 24th, and then he had a stipulated fact that on January 18th he stopped working at his job because of his shoulder problems. And the jury could... He then again had additional surgery on April 24th for nerve entrapment and for other results of the first surgery. And his medical records that I went through in closing argument and went through with him in cross-examination would show that he had many periods where he would report improvement, report pain had gone away. His pain became worse, but that possibly because his family in late June, or mid-June, excuse me, told him he should stop taking pain medications. So the jury could find, and I think this is the argument I made in closing argument, that for all we've said, at the end, the period of time for which he's entitled to some damages is the period from when he had this resurgence of pain in mid to late June, until the time that he had the X-ray, which identified an abnormal mass, which later was biopsy, and then he began treatment. The treatment, and the major issue about the treatment, and one of the things that Dr. Warden failed to even consider, was he only considered treatment, old-style treatment. Old-style treatment, which was chemotherapy, then radiation, then a resection of the tumor. But what he received, and which was new in 2018, was chemotherapy, radiation, and then immunotherapy. And Dr. Warden never even considered immunotherapy. He's a head and neck doctor, he's not a lung oncologist. And without considering that, the jury could equally say that he is no worse off today than he was on January 18th, but for the small period of pain that he incurred in that late-June to early-July period. And so I think that the jury made the right decision. I'm not going to put my place, and I've unfortunately been on the other side of these cases, where the jury gives a lot more money than I thought might be important, but it's not my job, or the court's job, I don't think, to substitute its evaluation for that of the jury. Thank you very much, my time is up. Thank you, counsel. Is there rebuttal time? His time had expired, Your Honor. Very good, the case has been thoroughly briefed and well-argued by experienced counsel this morning, and the argument's been helpful.